**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MARK CHAPPALEAR**,

       **Movant,**

**v.**

                                **Civil Action No. 3:12-cv-03482
(Criminal  No:  3:10-cr-00111-5)**

**UNITED STATES OF AMERICA**,

       **Respondent.**

**<u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>**

       Pending before the Court is Movant's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. (ECF No. 601). This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by Standing Order have been referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the undersigned respectfully **RECOMMENDS** that Movant's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 be **DENIED**, and that this action be removed from the docket of the Court. The undersigned conclusively **FINDS** that Movant is not entitled to the relief requested; therefore, an evidentiary hearing is not required. *Raines v. United States,* 423 F.2d 526, 529 (4th Cir. 1970).

1

## I.  Background and Procedural History

On July 1, 2010, a federal criminal complaint was issued against Moises Gamboa, a suspect in an ongoing criminal investigation into a marijuana distribution conspiracy operating, in part, within the Southern District of West Virginia. (S.D.W.V. No. 3:10-cr-00111-9, ECF No. 1).[1] In the course of the investigation, Movant Mark Chappalear ("Chappalear") became known to the investigating agents, and on June 2, 2010, Chappalear immediately confessed to his involvement in the conspiracy when approached by the agents. (ECF No. 607 at 6, 11-12). A grand jury target letter dated June 11, 2010 was subsequently issued to Chappalear, (ECF No. 1), after which Chappalear contacted the prosecutor, who provided him with paperwork to obtain an attorney. (ECF No. 607 at 7). Chappalear was appointed counsel on July 16, 2010, (ECF No. 4), and on July 27, 2010, Chappalear and seven other individuals were named in a three-count federal indictment and forfeiture. (S.D.W.V. No. 3:10-cr-00111, ECF No. 5). Chappalear was charged in Count One of the indictment with conspiring to knowingly and intentionally distribute 1,000 kg or more of marijuana, in violation of 21 U.S.C. § 841(a)(1). (*Id.* at 1).

### A.  Plea Agreement

On October 28, 2010, Chappalear signed a plea agreement agreeing to plead guilty to the charge contained in the indictment. (S.D.W.V. 3:10-cr-00111-5, ECF No. 480 at 7). In exchange, Chappalear received an agreement from the Government that the safety valve provision applied in his case, which conceivably would result in a

---

[1] Unless otherwise specified, citations to the record refer to documents corresponding with Chappalear's individual criminal case, S.D.W.V. Case No. 3:10-cr-00111-05.

two-level reduction in offense level under the Sentencing Guidelines.[2] (*Id.* at 4). The written agreement contained several provisions relevant to this § 2255 motion. First, Chappalear acknowledged that he had read and carefully discussed every part of the agreement with his counsel and understood the terms of the agreement. (*Id.* at 7). He also confirmed the following:

> I further acknowledge that my attorney has advised me of my rights, possible defenses, the Sentencing Guideline provisions, and the consequences of entering into this agreement, that no promises or inducements have been made to me other than those in this agreement, and that no one has threatened me or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

(*Id.*). Second, Chappalear agreed to waive his "right to challenge his guilty plea and his conviction resulting from this plea agreement, and any sentence imposed for the conviction, in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255" unless the motion was based upon a claim of ineffective assistance of counsel. (*Id.* at 5). Third, Chappalear specifically agreed to waive his right to appeal his sentence, except on limited grounds not present here. (*Id.*).

Chappalear accepted a base offense level of 34, with a two-level safety valve decrease, and a resulting adjusted offense level of 32 under the Sentencing Guidelines. (ECF No. 480 at 4). Chappalear expressly acknowledged that the Court and the Probation Office were not bound by this calculation under the Sentencing

---

[2] A defendant who meets the "safety valve" criteria set forth in U.S.S.G. § 5C1.2 is entitled to a 2-level decrease in offense level. U.S.S.G. § 2D1.1(b)(11) (2010 ed.). The "safety valve" provision allows certain defendants to avoid a statutory minimum sentence if the Court finds that "not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement." U.S.S.G. § 5C1.2(a)(5).

Guidelines, and "the parties shall not have the right to withdraw from the plea agreement due to a disagreement with the Court's calculation of the appropriate guideline range." (*Id.*).

Finally, Chappalear signed a Stipulation of Facts, which set forth the facts comprising the offense of conviction and relevant conduct for that offense. (*Id.* at 9). Chappalear stipulated that between 2007 and September 2009, he assisted Jacob Dodson "on at least 15 separate occasions with the receipt and redistribution of at least 500 pound[s] or more separate shipments of marijuana" by assisting "in the off loading and counting of the marijuana" and "in distributing the marijuana to other individuals."[3] (*Id.* at 8). Chappalear also admitted to recruiting Jason Luburgh into the conspiracy "by approaching him about using a warehouse owned by Luburgh's family to off load the marijuana." (*Id.*). Accordingly, Chappalear agreed that his total offense and relevant conduct involved 3,000 kg but less than 10,000 kg of marijuana. (*Id.*).

### B. Plea Hearing

On January 3, 2011, the presiding District Judge convened a plea hearing pursuant to Rule 11 of the Federal Rules of Criminal Procedure. (ECF No. 606). At the outset of the hearing, the Court verified Chappalear's competency to enter a plea. (*Id.* at 3-5). Chappalear indicated that he had adequately discussed his case with his lawyer, and that he was completely satisfied with the legal advice he had received. (*Id.* at 5). Chappalear's counsel summarized each paragraph contained in the plea

---

[3] During the plea colloquy, Chappalear stated that his last involvement in the conspiracy was actually in April 2009. (ECF No. 606 at 14). Chappalear also indicated that the amounts of marijuana he helped unload varied between 400 and 800 pounds, (ECF No. 14, 17), but agreed that delivery loads averaged 500 pounds. (ECF No. 606 at 17).

4

agreement, (*Id.* at 5-11), and the Court subsequently reviewed Count One of the indictment in detail, both reading the charge verbatim and taking time to explain to Chappalear the meaning of the key terms. (*Id.* at 12-14).

In his own words, Chappalear stated that from the Fall of 2007 to April of 2009, on at least fifteen separate occasions, he "helped Jacob Dodson unload small trailers that had anywhere from 400 to 800 pounds of marijuana in them," at Russell Nelson's house and Jason Luburgh's garage. (*Id.* at 14-16). Chappalear affirmed that he was aware that he was unloading marijuana to be distributed to other individuals for further distribution, and that over the course of his two-year involvement, he received approximately 600 to 800 pounds of marijuana, in 60 pound increments, in exchange for his assistance. (ECF No. 606 at 16-18). Chappalear indicated that the marijuana he received was fronted to him by Dodson with the intention of distributing to others, and that he would then repay Dodson after it had been distributed. (*Id.* at 18). Chappalear affirmed as correct that the total offense and relevant conduct attributable to him was at least 3,000 kg but less than 10,000 kg of marijuana, as the amount which he helped unload greatly exceeded the amount he actually received for his own distribution.  (*Id.* at 18-19).

DEA Agent Tom E. Bevins testified as to the Government's evidence supporting Chappalear's conviction. (*Id.* at 19-24). Agent Bevins stated that he and other officers from local task forces and the DEA had been investigating a marijuana conspiracy in Huntington, West Virginia, and Ohio. (*Id.* at 20). In the course of that investigation, they obtained information that Jacob Dodson was receiving large amounts of marijuana from a "Mexican source out of Mexico by the name of Moises

Gamboa." (*Id.*). During the investigation, they learned that Dodson had several people "throughout Southern Ohio and West Virginia distributing and assisting him in the off-loading of the marijuana, one being [Chappalear]." (ECF No. 606 at 20). Agent Bevins learned that Chappalear began assisting Dodson around 2007, and that "[h]is involvement mainly was to assist in off-loading and locating other warehouses to store the drugs and also would receive as partial payment drugs that was transported in." (*Id.* at 21). Agent Bevins testified that Dodson informed him of Chappalear's involvement, and that Chappalear had assisted Dodson on at least 15 occasions. (*Id.*). Furthermore, Agent Bevins indicated that "Chappalear was very cooperative and was able to confirm most of" the information Dodson provided, relaying that they "approached [Chappalear] on one occasion and he began to tell his part of the story" to the investigating agents. (*Id.*). Regarding the weight of the marijuana deliveries, Agent Bevins also testified that Chappalear himself "estimated between – on the smaller loads, smaller trailers, they were 500 [lbs] on each occasion; and then there was a larger trailer – it was a two-wheel base – was 800 [lbs], but on one occasion he recalled receiving at least 3,000 pounds" in one shipment. (*Id.* at 21-22). Agent Bevins stated that Chappalear was present when a 3,000 lb shipment arrived at Russell Nelson's residence, and that he was also instrumental in recruiting Mr. Luburgh's assistance, who allowed marijuana to be brought and stored in his garage on at least six occasions, with each shipment weighing at least 500 lbs. (*Id.* at 22-23). Agent Bevins testified that both Dodson and Chappalear informed him that Chappalear received marijuana from Dodson for distribution, which, on average weighed about 60 pounds each time. (ECF No. 606 at

23). Finally, Bevins confirmed that the marijuana Dodson and others received in Ohio was eventually making its way into West Virginia for redistribution. (*Id.*). Chappalear confirmed that Agent Bevins's testimony was substantially correct, and the Court subsequently found that there was a sufficient factual basis for Chappalear's' guilty plea. (*Id.* at 24).

The Court then interviewed Chappalear regarding his understanding of the penalties associated with a conviction on the charge, as well as the civil rights and benefits he would abandon by entering a guilty plea. (*Id.* at 24-27). Chappalear explicitly confirmed his understanding that he faced a mandatory minimum sentence of at least 10 years' imprisonment under the plea, as well as a term of supervised release up to five years, a fine of up to $4 million or twice the amount of gain or loss resulting from his conduct, whichever was greater, and a $100 special assessment. (*Id.* at 25-26). The Court also verified that Chappalear understood that if he withdrew from the agreement or breached its terms, the Government could introduce the stipulation as evidence at trial. (*Id.* at 27). The Court reviewed the plea agreement with respect to the sentencing guideline calculations, ensuring that Chappalear understood that the Court could not determine a sentencing range until his presentence report was completed, that the Court could impose a sentence that differed from his attorney's estimate and from the sentencing guidelines recommendation, that neither the probation office nor the court were bound by the plea agreement, and that Chappalear could not withdraw from the plea agreement if he disagreed with the Court's calculation of the guideline range. (ECF No. 606 at 27-28). Chappalear confirmed that he had agreed to waive his right to appeal any

sentence falling within the applicable guidelines range for an adjusted offense level of 32. (*Id.* at 29). Chappalear stated his understanding that he also had waived his right to collaterally attack his conviction and sentence except on the ground of ineffective assistance of counsel. (*Id.*). Consequently, the Court found that Chappalear understood the nature of the charge and the consequence of his guilty plea. (*Id.* at 30).

Regarding his Constitutional rights, Chappalear understood that he was giving up his rights to plead not guilty to the charge, to have a speedy and public jury trial, to force the Government to produce witnesses and evidence against him, to be presumed innocent until the Government presented enough evidence to convince the judge and jury beyond a reasonable doubt of his guilt, to have the assistance of his lawyer at trial, to confront the witnesses and cross-examine them to test the truth of their statements, to bring his own witnesses to court, to remain silent and not present any evidence, and have the jury instructed that they could not consider the exercise of these rights against him. (*Id.* at 30-32).   Accordingly, the Court found that Chappalear understood the rights he was giving up by pleading guilty. (*Id.* at 32).

Chappalear denied that anyone had forced, threatened, or talked him into pleading guilty against his will and confirmed that he was acting voluntarily and of his own free will in entering his guilty plea. (ECF No. 606 at 32). When asked if pleading guilty was his own idea, Chappalear stated that "[i]t was an agreeance between [him] and [his] attorney," but that he understood that it was his decision to make. (*Id.*). Chappalear also denied that anyone had promised him something or told him anything different from what was discussed in court in order to induce him to

plead guilty. (*Id.*). Thus, the Court found that Chappalear's plea was voluntary, and Chappalear executed his plea of guilty. (*Id.* at 32-33).

The Court restated its findings that Chappalear was fully competent and capable of entering an informed plea, there was a factual basis for his guilty plea, he understood the nature of the charge and the consequences of pleading guilty, he understood the rights he was giving up by pleading guilty, and his plea was voluntary. (*Id.* at 33). The Court accepted Chappalear's plea of guilty, but deferred accepting the plea agreement until reviewing the presentence report, and adjudged him guilty of the charge contained in the indictment. (*Id.*).

### C. Sentencing Hearing

On October 11, 2011, Chappalear appeared for his sentencing hearing. (ECF No. 607). He testified that he had read the probation department's presentence report and discussed it with his attorney. (*Id.* at 2). The Court accepted the presentence report and addendum after finding sufficient indicia of reliability to support the probable accuracy of its contents, and also accepted the plea agreement. (*Id.* at 3). Chappalear's base offense level was 34 pursuant the drug quantity table contained in U.S.S.G. § 2D1.1. (*Id.* at 4). The Court deducted two levels from Chappalear's offense level under the "safety valve" provision, noting that U.S.S.G. § 5C1.2 also allowed the Court "to impose a sentence below what would otherwise be a mandatory minimum by statute." (*Id.*). Chappalear received another two-level deduction for acceptance of responsibility, and the Government moved for a third level deduction, which brought his total offense level down from 34 to 29. (*Id.*). Chappalear had no criminal history points, which placed him in Criminal History

Category I, and resulted in an advisory sentencing range of 87 t0 108 months. (ECF No. 607 at 4-5).

Chappalear's attorney advocated for a downward variance, highlighting Chappalear's minimal criminal history, his early cooperation with the Government, his non-instrumental role in the conspiracy, and his strong family support. (*Id.* at 6-8). In particular, counsel stressed that Chappalear was first contacted by the Government on June 2, 2010, and "[a]t that time he confessed to his involvement in the case." (*Id.* at 6). As counsel explained "he's cooperated from the very beginning of this," but "the problem he runs into is that he wasn't one of the first people" to be investigated regarding the conspiracy, and as a result the usefulness of the information he provided was diminished. (*Id.* at 7). In contrast, the United States opposed a downward variance on the grounds that the sentencing guidelines already accounted for his limited criminal history, he served as Dodson's "right-hand man" in the conspiracy, and "he was well aware of the scope and the amount of marijuana involved and where it was coming from." (*Id.* at 10). The United States agreed that Chappalear's "ability to help himself would have been limited given the people who had already come in," but also noted that Chappalear did not testify before the grand jury after receiving a target letter. (*Id.* at 11). The United States did, however, concede that Chappalear "did confess to the agents when they approached him," that his confession implicated other individuals in the conspiracy, and that "the statement he provided when first questioned comport[ed] with what [the Government] now know[s] of his involvement." (ECF No. 607 at 10-11). Chappalear's counsel clarified that although he had not testified before the grand jury, Chappalear believed "that he

10

had responded to [the target letter] by calling [the prosecuting attorney] at her office about a week after that" and filling out the paperwork she provided him. (*Id.* at 12). When given an opportunity to speak in mitigation of his sentence, Chappalear apologized for his actions and expressed his intent to improve himself while incarcerated. (*Id.* at 13).

The Court granted Chappalear a limited variance in light of his cooperation, by further reducing his offense level by two points, "for the fact that he immediately provided all the information that he could, and it seems to me that the unfortunate circumstance he faces is that the Government just really didn't need his help and couldn't really use his help to thereby justify a substantial assistance motion." (*Id.* at 14). Accordingly, the Court sentenced Chappalear to 70 months imprisonment, which corresponded with the low end of the applicable guidelines range for an offense level of 27.[4] (*Id.*). The Court further recommended that Chappalear be housed in a facility as close as possible to Zanesville, Ohio, and that he be allowed to participate in the Comprehensive Drug Abuse Treatment Program. (*Id.* at 14-15).

### D. Instant Action

Chappalear did not appeal his conviction, but on July 19, 2012, he timely filed the instant § 2255 action, alleging that he had received ineffective assistance of counsel. (ECF No. 601 at 13). On September 6, 2012, the United States filed a Response in opposition, (ECF No. 612), and on October 18, 2012, Chappalear filed his Reply. (ECF No. 627).

---

[4] The Court also imposed supervised release for a term of three years following his release from prison. (ECF No. 607 at 15).

## II.   Movant's Grounds to Vacate, Set Aside, or Correct His Sentence

Chappalear asserts that trial counsel "rendered ineffective assistance, thereby depriving the Petitioner of his Sixth Amendment Right to Counsel and violative of *Strickland* and its progeny." (ECF No. 601 at 13). Specifically, Chappalear alleges that:

1. Trial counsel was ineffective in his "failure to reasonably negotiate a Plea Agreement that would result in sentencing parity with his co-defendants and which would be based on an appropriate calculation of the § 3553(a) factors." (*Id.*); and

2. Trial counsel was "ineffective prior to and at sentencing in arguing in favor of a lower term of imprisonment for the Petitioner, consistent with the sentencing determination of the Petitioner's co-defendants and upon a proper application of the § 3553(a) factors." (*Id.*).

## III.   Standard Under 28 U.S.C. §2255

A motion made pursuant to 28 U.S.C. § 2255 is a collateral attack on a conviction or sentence imposed in a separate proceeding. *Wall v. Kholi*, 131 S.Ct. 1278, 1284-85, 179 L.Ed.2d. 252 (2011). To succeed on such a motion, the movant must prove that the conviction or sentence was imposed in violation of the laws or Constitution of the United States; or the court imposing the sentence lacked jurisdiction; or the sentence exceeded the maximum authorized by law; or the sentence was otherwise subject to collateral attack. 28 U.S.C. § 2255. Because a § 2255 motion seeks to deny, evade, or impeach a judgment, claims of error that have previously been raised and rejected on a direct appeal of the judgment may not be raised again in a § 2255 motion. *United States v. Harrison*, No. 96-7579, 1997 WL 499671, at *1 (4th Cir. Aug. 25, 1997).

12

Nonetheless, a § 2255 motion is not an alternative to filing a direct appeal. *United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). "Nonconstitutional claims that *could* have been raised on direct appeal, but were not, may not be asserted in collateral proceedings." *Stone v. Powell*, 428 U.S. 465, 477, n.10, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (emphasis added); *see also United States v. Linder*, 552 F.3d 391, 396-97 (4th Cir. 2009) ("Where the petitioner only waives the right to appeal, he is not precluded from filing a petition for collateral review. But he is precluded from raising claims that are the sort that *could have* been raised on appeal.") (quoting Brian R. Means, *Fed. Habeas Practitioner Guide,* Jurisdiction ¶ 1.23.0 (2006/2007)) (emphasis in the original). Nonconstitutional claims that *could not* have been asserted on direct appeal may be raised in a § 2255 motion only if the alleged error constituted "a fundamental defect which inherently results in a complete miscarriage of justice" *Stone*, 428 U.S. at 477 n.10 (quoting *Davis v. United States*, 417 U.S. 333, 346, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974); *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)) or is "inconsistent with the rudimentary demands of fair procedure." *United States v. Timmreck*, 441 U.S. 780, 784, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979).

Similarly, a constitutional error that could have been, but was not raised on appeal may not be raised for the first time in a § 2255 motion, unless the movant can show either (1) "cause" that excuses the failure to raise the error on appeal and "actual prejudice" resulting from the error; or (2) that a miscarriage of justice would occur if the court refuses to entertain the collateral attack. *Massaro v. United States*, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed. 2d 714 (2003); *Bousley v. United States*,

523 U.S. 614, 621-22, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998); *Frady,* 456 U.S. at 167-68; *United States v. Mikalajunas,* 186 F.3d 490, 492-93 (4th Cir. 1999). To establish "actual prejudice," the movant must show that the alleged error resulted in an "actual and substantial disadvantage," rather than a mere possibility of prejudice. *Satcher v. Pruett,* 126 F.3d 561, 572 (4th Cir. 1997) (quoting *Murray v. Carrier,* 477 U.S. 478, 494, 106 S.Ct. 2639, 2648 (1986)). To demonstrate a miscarriage of justice, the movant must prove "actual innocence" of the crime for which he was convicted, substantiating that "it is more likely than not, in light of all the evidence, that no reasonable juror would have convicted him." *Bousley,* 523 U.S. at 623 (quoting *Schlup v. Delo,* 513 U.S. 298, 327-28, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)).

A guilty plea further diminishes the scope of potential claims available under § 2255. A voluntary and intelligent guilty plea amounts to an admission of the material elements of the charged crime, *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); consequently, it constitutes a waiver of *all claims* relating to non-jurisdictional errors that occurred prior to the plea, including claims relating to alleged constitutional deprivations. *United States v. Moussaoui,* 591 F.3d 263, 279 (4th Cir. 2010); *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973)). "Thus where a defendant does not challenge the jurisdiction of the court's power to enter the conviction or impose the sentence, the [§ 2255] inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States. v. Fabian*, 798 F.Supp.2d 647, 669 (D. Md. 2011) (quoting *United States v. Broce,* 488 U.S. 563, 569, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989)) (internal quotations omitted); *see also Tollett*, 411 U.S. at 266 (holding that in the

14

context of a guilty plea, the "focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea not the existence as such of an antecedent constitutional infirmity").

Under the Rules Governing Section 2255 Proceedings, the reviewing court must examine the motion, answer, any transcripts and record of prior proceedings, and any other materials supplied by the parties to determine the need for an evidentiary hearing. If the motion can be resolved based on the record before the court, an evidentiary hearing is unnecessary. *Raines,* 423 F.2d at 529. With this framework in mind, the undersigned examines each of Chappalear's allegations.

## IV.   <u>Analysis</u>

Chappalear argues that trial counsel provided ineffective assistance by: (1) advising him "to plead guilty and to admit to a drug quantity that was not evidentiarily supportable, rendering the Petitioner's guilty plea to be unknowing and involuntary." (ECF No. 602 at 4); and (2) "failing to effectively argue in favor of a sentence determination [in] parity with the sentencing results of the other, and at best, similarly situated Defendants." (ECF No. 602 at 6). The undersigned addresses both objections in turn.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel during critical stages of criminal proceedings, *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), including plea-bargaining, *Lafler v. Cooper*, 132 S. Ct. 1376, 1384-86, 182 L.Ed.2d 398 (2012), and direct appeal. *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). While assistance "which is ineffective in

preserving fairness does not meet the constitutional mandate," *Strickland,* 466 U.S. at 685-86, "defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2001).

Under *Strickland*, a defendant can prove ineffective assistance of counsel by meeting the requirements of a two-prong test. The defendant carries the burden of satisfying both prongs of the test, and "a failure of proof on either prong ends the matter." *United States v. Roane,* 378 F.3d 382, 404 (4th Cir. 1994). First, the defendant must show that counsel's representation fell below an objective standard of reasonableness. When evaluating counsel's performance under the first prong of *Strickland,* "judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Thus, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). The inquiry under Strickland is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (internal quotations omitted).

The second prong of the *Strickland* test requires the defendant to affirmatively establish prejudice; that is, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. In the context of a guilty plea, the prejudice

prong of *Strickland* requires the defendant to demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). In the context of an appeal, the defendant must demonstrate a reasonable probability that, but for his counsel's failure to raise a particular issue, he would have prevailed on the appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

### A. Plea Agreement and Drug Quantity

Chappalear argues that his trial counsel provided ineffective assistance by negotiating a plea agreement which included a stipulation of facts attributing 3,000 to 10,000 kg of marijuana to Chappalear in relevant conduct. (ECF Nos. 602, 627). According to Chappalear, "there is no sufficient evidence in support of the calculation" of marijuana weight, and therefore counsel's failure "to consult with and attempt to negotiate a plea (and attendant stipulation of facts) that did not include or specify drug quantity, constituted objectively unreasonable performance." (ECF No. 602 at 5). Chappalear argues that the Government's evidence of his relevant conduct was insufficient because it "relied entirely and only on the testimony of co-defendant 'snitches,'" whom Chappalear believes received a sentence reduction under U.S.S.G. § 5K1.1 for their assistance. (ECF No. 602 at 5 n.1).

It is well established that in calculating drug amounts for relevant conduct, "the court may consider any relevant information, provided that the information has sufficient indicia of reliability to support its probable accuracy." *United States v. Jacobs*, 70 F. App'x 689, 692 (4th Cir. 2003) (citing *United States v. Uwaeme*, 975

F.2d 1016, 1021 (4th Cir. 1992)). Contrary to Chappalear's contention that the Government had no evidence of drug quantity other than that supplied by "snitches," the transcript of the plea hearing confirms that Chappalear's statements to law enforcement corroborated information obtained from other sources. Special Agent Blevins testified that Mr. Dodson informed him of Chappalear's involvement in the conspiracy, and more specifically informed him that Chappalear had assisted Dodson in handling shipments of marijuana approximately fifteen times. (ECF No. 606 at 21). On at least one of those fifteen occasions, the shipment contained more than 3000 pounds of marijuana. These statements regarding Chappalear's relevant conduct were corroborated by Chappalear in conversations he had with investigators prior to being indicted.[5] (ECF No. 606 at 21-22). The District Court found that this testimony, which was confirmed as accurate by Chappalear at the plea hearing, provided a sufficient factual basis to accept Chappalear's guilty plea. (ECF No. 606 at 24).

As a result of Chappalear's plea agreement, he avoided a statutory mandatory minimum sentence of 10 years imprisonment,[6] and also received a total reduction of 7 offense levels, including (1) a 2-level reduction under the "safety valve" provisions

---

[5] Chappalear also verified his relevant conduct in his sworn testimony during the Rule 11 plea colloquy. (ECF No. 606 at 18-19). Chappalear's current contention that "it was virtually impossible to verbally 'stray' from [the] binding powers" of the plea agreement at the plea hearing is unavailing. The transcript of the hearing reveals that Chappalear had no problem making oral modifications to the stipulation of facts. Notwithstanding his clarifications on the record, which were undoubtedly intended to downplay his role in the conspiracy, Chappalear never contested his involvement with shipments totaling more than 3000 kg of marijuana,. (ECF No. 606 at 14-19).

[6] A criminal defendant convicted of drug distribution involving "1,000 kilograms or more of a mixture or substance containing a detectable amount of marihuana, or 1,000 or more marihuana plants regardless of weight" is subject to a mandatory "term of imprisonment which may not be less than 10 years or more than life. . ." 21 U.S.C. § 841(b)(vii). Thus, even if Chappalear had not stipulated to relevant conduct involving 3,000 to 10,000 kg of marijuana, he would still have been subject to the mandatory minimum sentence of 10 years imprisonment.

contained in U.S.S.G. §§ 2D1.1(b)(11) & 5C1.2; (2) a 2-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a); (3) a 1-level reduction for timely notifying authorities of his intention to enter a guilty plea under U.S.S.G. § 3E1.1(b); and (4) a further 2-level downward variance "for the fact that he immediately provided all the information that he could," even though his information did not substantially assist the Government's investigation. (ECF No. 607 at 4, 14). Given that Chappalear had already confessed to his involvement in the conspiracy before obtaining an attorney, and was facing a mandatory minimum sentence of at least 10 years imprisonment, his counsel did not act unreasonably in advising Chappalear to accept the plea agreement, despite the fact that it included an accurate stipulation as to his relevant conduct. *See Fabian*, 798 F.Supp.2d at 672 ("An assessment of the probable increase or reduction in sentence relative to the plea if the defendant proceeds to trial is clearly relevant to the determination of whether an attorney acted competently in recommending a plea.").

Accordingly, the undersigned **FINDS** that Chappalear's counsel did not provide ineffective assistance for advising Chappalear to accept the plea agreement and accompanying stipulation of facts.

### B. Sentencing Parity

Chappalear also alleges that he received ineffective assistance because his sentence was not in parity with the sentences of his co-defendants. (ECF No. 602 at 6). Chappalear asserts that "[i]t is clear and uncontested that Chappalear was a minor participant in the instant drug conspiracy," and that as a result of his attorney's ineffective assistance, "[h]e was, nonetheless, sentenced to a significantly greater

term of imprisonment than several of his co-defendants, each of whom 'played' a far greater role in the case." (ECF No. 627 at 3). Chappalear argues that "trial counsel's failure to secure a plea agreement, with recommended sentencing guideline range, consistent with that of several co-defendants constituted ineffective assistance of counsel." (*Id.*). He also asserts that counsel should have argued, both in his § 3553(a) sentencing memorandum and at the sentencing hearing, in favor of a sentence that was equal or shorter in length than those imposed upon his co-defendants. (ECF No. 602 at 6-7). These arguments are entirely nonmeritorious.

To begin with, Chappalear was the first among seven co-defendants to enter into a plea agreement. (ECF No. 480; S.D.W.V. No. 3:10-cr-00111, ECF Nos. 310, 341, 338, 351, 362, 366). Therefore, no other agreement existed for comparison purposes. The Court may not engage in the kind of hindsight review that would be necessary to conclude that counsel's assistance was deficient for failure to obtain a plea agreement consistent with agreements reached months later. *See United States v. Lopez*, 343 F. App'x 950, 951 (4th Cir. 2009) ("A reviewing court cannot engage in hindsight; rather, the reasonableness of counsel's performance is evaluated within the context of the circumstances at the time of the alleged error.").

Second, Chappalear's counsel did in fact file a memorandum addressing the sentencing factors contained in 18 U.S.C. § 3553(a), which included an argument for leniency "to avoid unwarranted sentence disparities [among] defendants with similar records who have been found guilty of similar conduct." (ECF No. 461). Furthermore, Chappalear offers no evidence to support his claim that he received a "greater term of imprisonment than co-defendants far more involved in the criminal venture" than he,

20

(ECF No. 627 at 3), nor do the stipulations of fact contained in their respective plea agreements necessarily reflect as much.[7] (ECF Nos. 310, 341, 338, 351, 362, 366). At any rate, the Fourth Circuit has repeatedly held that "the sentencing factor addressing sentencing disparities, 18 U.S.C. § 3553(a)(6), is aimed primarily at eliminating national sentencing inequity, not differences between the sentences of co-defendants." *United States v. Robinson*, -- F. App'x --, No. 12-4911, 2013 WL 4017322 (4th Cir. 2013) (citing *United States v. Withers,* 100 F.3d 1142, 1149 (4th Cir.1996)).

Third, during the sentencing hearing, counsel advocated in favor of a downward variance for Chappalear. (ECF No. 607 at 5). Although counsel did not explicitly argue that Chappalear was entitled to a sentence in parity with that of his co-defendants, counsel (1) highlighted the fact that Chappalear was "not instrumental" in the conspiracy, as "the shipping of marijuana into Ohio and the distributing of the marijuana" would have gone on without him. (*Id.* at 7); and (2) stressed that although Chappalear had been immediately forthcoming with information regarding his involvement, unlike other related defendants, Chappalear was unable to benefit from a substantial assistance sentencing reduction because the Government had not contacted him until later in the investigation. (*Id.*). Ultimately, the district court granted Chappalear a limited variance for his cooperation, specifically explaining:

---

[7] The record also reflects that some of Chappalear's co-defendants received longer sentences than he did, and some received shorter sentences. Chappalear can hardly hold his counsel responsible for the discretion exercised by the District Court in determining the appropriate sentences; particularly, as Chappalear was advised on multiple occasions that the Court retained that discretion regardless of any plea agreement.

> I've handled sentencing in a number of other matters, other defendants indicted under the same indictment. The Government has been in a position to offer substantial assistance motions for one or more of those individuals because they were in a position to actually help the Government pursue its investigation or to be able to prove its case against various defendants at trial. Here it seems that Mr. Chappalear did as much as he could as soon as he could. . . So I think this is one of those few cases where a defendant has done all he could, but the Government just really didn't need his help and couldn't really use his help to thereby justify a substantial assistance motion.

(*Id.* at 13-14). Although Chappalear now asserts that counsel erred in failing to obtain a sentence in parity with his co-defendants, the record demonstrates that counsel argued vigorously on Chappalear's behalf, and was successful in obtaining a 2-level downward variance for Chappalear, as a result of the Court's consideration of the sentencing proceedings for his co-defendants. As such, counsel's representation was clearly reasonable and competent.

Consequently, the undersigned **FINDS** that Chappalear did not receive ineffective assistance of counsel during his sentencing.

## V.   **Proposal and Recommendations**

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the District Court accept and adopt the findings proposed herein and **RECOMMENDS** the following:

1.     Movant's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255  (ECF No. 601) be **DENIED**;

2.     This civil action be **DISMISSED, with prejudice,** and removed from the docket of this Court.

Movant is notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States

Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Movant shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Movant, Respondent, and counsel of record.

**FILED**: October 15, 2013.

Cheryl A. Eifert
United States Magistrate Judge